

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOCELYN HEMPHILL,  :
    Plaintiff,  :
      :
      : *18-2451*
v.  : Civil Action No. ~~2:18-cv-0245~~-WB
      :
NATIONSTAR MORTGAGE LLC  :
D/B/A MR. COOPER,  :
EVERBANK, and  :
MILSTEAD & ASSOCIATES, LLC,  :
      :
    Defendants.  :
      :

**FILED**

JUL - 5 2018

KATE BARKMAN, Clerk
By_____ Dep Clerk

## AMENDED COMPLAINT

Plaintiff, Jocelyn Hemphill, by and through her counsel, The Mays Law Firm PC, brings this action to abate the deceptive, unfair and illegal debt collection practices of the Defendants, and in support thereof, sets forth the following:

### I.  PARTIES

1. Plaintiff Jocelyn Hemphill ("Hemphill") is a natural person and resides at her home located at 7171 North 20th Street, Philadelphia, PA 19138.

2. Defendant Nationstar Mortgage, LLC d/b/a Mr. Cooper ("Nationstar") is a foreign limited liability company with a place of business at 350 Highland Drive, Lewisville, TX 75067.

3. Defendant Everbank is a federal savings bank with a place of business at 501 Riverside Ave., Jacksonville, FL 32202.

4. Defendant Milstead & Associates, LLC ("Milstead") is a foreign limited liability company with a place of business at 1 E. Stow Road, Marlton, NJ 08053.

## II.   JURISDICTION AND VENUE

5.  The Court has removal jurisdiction over this matter originally filed in the Philadelphia Court of Common Pleas pursuant to 28 U.S.C. § 1441(b) and (c).

6.  Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) as the events giving rise to Plaintiff's claims occurred within the Eastern District of Pennsylvania.

## III.   STATEMENT OF FACTS

7.  Hemphill has owned her home in the West Oak Lane section of Philadelphia for over thirty years.

8.  In July 1986, Hemphill obtained aloan in the amount of $33,216.00, secured by a mortgage on her home (the "Mortgage").

9.  The original lender on the Mortgage was identified as Travelers Mortgage Services, Inc.

10. The very same day that the Mortgage was originated, the Mortgage began changing hands frequently between several lenders and servicers.

11. As Hemphill's loan was transferred from entity to entity, it passed through the hands of the some of the most notorious sub-prime mortgage servicers and lenders in the country. This list includes Wells Fargo, Lehman Brothers and Countrywide Home Loans; lenders and servicers whose reckless mortgage practices decimated neighborhoods throughout Philadelphia.

12. As Hemphill's loan passed through the hands of America's biggest foreclosure-servicing abusers, the transfers remained mostly undocumented. So, while banks like Wells Fargo and Countrywide would claim to hold the loan, there was rarely, if ever, an actual assignment of the Mortgage or indorsement of the Mortgage's note.

### a. THE SERIAL FORECLOSURE SAGA

#### i. THE EVERBANK FORECLOSURE (FORECLOSURE NO. 1)

13. In September 2008, Countrywide Home Loans Servicing LP ("Countrywide") claimed ownership of Hemphill's loan.

14. Countrywide's illegal, deceptive and unfair mortgage servicing practices are well documented. In fact, Countrywide's foreclosure abuses were so pervasive that they led to a $16.65 Billion settlement between Bank of America (Countrywide's parent company) and the United States Department of Justice. At the time, this was the largest civil settlement between the Department of Justice and a single company in American history.

15. Countrywide employed the same illegal, deceptive and unfair servicing practices admonished by the Department of Justice while servicing Hemphill's loan.

16. Although Countrywide claimed to hold the mortgage on Hemphill's home, the Mortgage was never assigned to Countrywide and Countrywide never held the Mortgage's note.

17. On September 2, 2008, Countrywide claimed that Hemphill was in default of the Mortgage and sent Hemphill a notice of intention to foreclose on her home.

18. Countrywide engaged in predatory foreclosure tactics, designed to mislead and deceive unsophisticated borrowers such as Hemphill. For example, the September 2008 notice advised Hemphill that if the alleged default "is not cured within **THIRTY-FIVE (35) DAYS**, the mortgage **will be accelerated**. This means...you may lose the chance to have the original mortgage paid off in monthly installments." (Emphasis in the original).

19. Threats such as this from Countrywide were untrue because, under Pennsylvania's Loan Interest and Protection Law, Hemphill had the legal right to reinstate at any time up to one hour before a sheriff's sale of her home.

20. On October 13, 2009, a foreclosure complaint was filed by Everbank. A true and correct copy of the complaint is attached as Exhibit A.

21. The complaint alleged that Everbank now owned the loan and it contained an assignment of the Mortgage from GE Mortgage Services, LLC to Everbank.

22. Although the assignment appeared as though it was signed by an officer of GE Mortgage Services, LLC, the persons signing and witnessing the documents were employees of Wells Fargo, not GE Mortgage Services, LLC.

23. No employee or officer of GE Mortgage Services, LLC ever actually assigned the loan to Everbank and the assignment attached to the Everbank complaint was never actually recorded in the Philadelphia Department of Records.

24. The Everbank complaint sought a principal balance of $60,082.12, along with interest and other charges, almost double the original principal balance of the loan given more than two decades prior.

25. The Everbank complaint was drafted and filed by the law firm of Goldbeck McCafferty & McKeever.

26. The Complaint contained the purported signature of attorney Michael T. McKeever, but, in fact, the signature is not McKeever's. McKeever later admitted in separate litigation that his firm allowed non-attorney assistants and support staff to sign his name and file foreclosure cases without any meaningful attorney review by McKeever.

27. After admitting to prosecuting foreclosures without attorney involvement, the Goldbeck firm changed its name to KML Law Group.[1]

28. The Complaint also contained a verification that, once again, was verified only by non-attorney support staff forging McKeever's signature.

29. Everbank ultimately obtained a default judgment in the amount of $74,219.89 on September 22, 2010 and scheduled Hemphill's home for Sheriff's Sale.

### ii. THE AURORA FORECLOSURE (FORECLOSURE NO. 2)

30. On December 8, 2010, while Hemphill's home was scheduled for Sheriff's Sale in the Everbank foreclosure (Foreclosure No. 1), Aurora Loan Services, LLC ("Aurora") sent a notice of intention to foreclose on the same mortgage.

31. The notice sought payment for the same default alleged in the Everbank foreclosure (Foreclosure No. 1).

32. The notice advised Hemphill that if she paid the amounts stated in the letter within thirty days, "you will not be obligated to pay attorney fees[.]"

33. The amounts demanded in the letter, however, contained a line item for "Corporate Advance[s]". These corporate advances were, in fact, "attorney" fees from the Everbank foreclosure for work performed by the Goldbeck firm, although not identified as such.

34. Aurora subsequently referred the loan to the law firm of Phelan Hallinan & Schmieg, LLP (now known as Phelan Hallinan Diamond & Jones, LLP).

35. Upon information and belief, the law firm determined that the attorney fee demand disguised as "Corporate Advance" was deceptive or otherwise contrary to Pennsylvania law and advised Aurora to send a new notice.

---

[1] https://www.bizjournals.com/philadelphia/print-edition/2011/09/30/facing-legal-issues-goldbeck.html

36. Aurora agreed to have the new notice sent by Phelan so that the deceptive notice sent by Aurora would not have to be attached to the complaint.

37. On January 18, 2011, Phelan Hallinan & Schmieg, LLP sent another notice of intention to foreclose (the "Third Notice"), Phelan removed the disguised 'attorney fee' demand from the Third Notice.

38. Additional attorney fees were paid to Phelan for this Third Notice and added to Hemphill's account.

39. The Third Notice claimed, without explanation, that Aurora Loan Services, LLC was now the owner of the mortgage.

40. After sending the Third Notice, Aurora had the Everbank judgment vacated and the Everbank foreclosure (Foreclosure No. 1) was discontinued.

41. On March 9, 2011, Aurora filed another foreclosure complaint in the Philadelphia Court of Common Pleas, seeking to foreclose on the mortgage a second time for the same alleged default ("Foreclosure No. 2").

42. Although Aurora had demanded thousands of dollars in attorney's fees in its notice of intention to foreclose, Aurora's attorneys removed these fees from Aurora's demand in the foreclosure complaint.

43. The complaint was served by mail and posting, and a second default judgment was entered on December 8, 2011.

44. After learning about the judgment, Hemphill hired private counsel and filed a petition to open the judgment.

45. Hemphill's petition to open the judgment was granted on April 9, 2012.

46. On April 18, 2012, Hemphill filed preliminary objections to Aurora's Complaint. These objections challenged Aurora's standing as holder of the mortgage note and sought the production of the original mortgage note.

47. Hemphill's objections were sustained, and Aurora was directed to file an amended complaint.

48. Aurora filed an amended complaint on June 19, 2012. A true and correct copy of the amended complaint is attached as Exhibit B.

49. In response to the objections sustained by the Court, Aurora attached what it claimed was a copy of the original mortgage note.

50. The copy attached to the complaint was not actually a copy of the original note. Aurora failed to disclose that it actually did not have possession of the note, and never did. Instead, Aurora attached altered copies of what it claims was the "original" in an attempt to mislead Hemphill and the Court into believing that Aurora actually had possession of the document.

51. Upon information and belief, Aurora doctored copies of the note to remove indications that the attached copy of the note was not actually a copy of the original. For example, documents later obtained by Hemphill demonstrate that Aurora and/or their counsel used "white out" or correction fluid to remove markings and notations on the documents which demonstrated that they were not copies of the original.

52. After the amended complaint was filed, Nationstar Mortgage, LLC ("Nationstar") assumed the servicing of the Mortgage and substituted itself as the plaintiff in Foreclosure No. 2.

53. On October 20, 2013, while Foreclosure No. 2 was still pending, Nationstar sent a fourth notice of intention to foreclose on Hemphill's home (the "Fourth Notice").

54. The Fourth Notice claimed the same alleged default as set out in the three prior notices.

55. The Fourth Notice advised that **"[i]f you cure the default within the THIRTY (30) DAY period** [after service of the notice], **you will not be required to pay attorney's fees."**

56. While the first notice claimed that no attorney fees were due if paid within thirty days, the Notice contained a line item for a "Corporate

Advance Balance" of $11,064.55. This "Corporate Advance Balance" actually consisted of, *inter alia*, attorney fees for Foreclosure No. 1 and Foreclosure No. 2, although not disclosed as such.

### iii. THE NATIONSTAR FORECLOSURE (FORECLOSURE NO. 3)

57. On July 2, 2014, while Foreclosure No. 2 was still pending, Nationstar commenced a third foreclosure action in the Philadelphia Court of Common Pleas for the same default.

58. Nationstar's complaint alleged the same default as Foreclosure Nos. 1 and 2 and demanded judgment in the amount of $99,126.17, almost triple the original balance of the loan.

59. The complaint alleged that Hemphill executed a mortgage note and attached a "true and correct" copy of the purported note to the complaint. A true and correct copy of the complaint is attached as Exhibit C[2].

60. Unbeknownst to Hemphill, Nationstar went to great lengths to hide the fact that it did not actually possess the mortgage note, and never did. For example, the copy attached to the complaint was doctored using correction fluid or "white out" to conceal markings which indicated that it was not a copy of the original note.

61. The copy of the purported note attached to the complaint contained only three indorsements, and was specifically indorsed to Travelers Mortgage Services, Inc., not Nationstar.

62. On September 16, 2014, Nationstar's counsel filed a praecipe to attach a new copy of the alleged mortgage note. A true and correct copy of the praecipe is attached as Exhibit D.

63. This new copy of the mortgage note had an additional indorsement; however, this copy was also doctored using correction fluid or "white out"

---

[2] Due to its size, the July 2, 2014 Complaint is attached without exhibits. The full complaint with Exhibits can be found at Doc. No. 1, and is incorporated herein by reference.

to remove markings on the document indicating that it was not the original.

64. At no time did Nationstar disclose that it never actually held the original mortgage note, instead Nationstar, their agents and/or counsel engaged in a pattern of altering documents to actively conceal the fact that the documents being copied were not originals.

65. In November 2014, Nationstar filed a praecipe to discontinue Foreclosure No. 2.

66. Foreclosure No. 3 proceeded to the Court's Residential Mortgage Foreclosure Diversion Program.

67. The matter was later removed from the program by order entered on July 13, 2016.

68. Hemphill retained private counsel and filed preliminary objections to the complaint in Foreclosure No. 3. Hemphill specifically objected to Nationstar's standing to enforce the mortgage note.

69. In response to Hemphill's objections in Foreclosure No. 3, Nationstar admitted, for the first time, that Nationstar never possessed the mortgage note. Instead, Nationstar possessed an alleged "Lost Note Affidavit" signed in 2004 by an officer of GE Capital Mortgage Services, Inc.

70. Nationstar, through its counsel, Milstead & Associates, LLC, subsequently filed a motion for summary judgment in Foreclosure No. 3 on June 29, 2017.

71. In its motion, Nationstar's alleged that "[Nationstar] is entitled to enforce the Mortgage by way of its possession of the original note." *See* Motion for Summary Judgment, ¶ 8.

72. Nationstar's counsel doubled down in their claims that Nationstar now possessed the original note, setting out a section in Nationstar's motion titled "**STATEMENT OF UNCONTESTED FACTS**", in which it was

alleged again that "[Nationstar] has also established standing by demonstrating possession of the Note..." *See* Memorandum of Law in Support of Summary Judgment, pg 2.

73. To support their statements that Nationstar possessed the original note, Nationstar submitted the sworn affidavit of Ryan Cable, a document execution specialist employed by Nationstar.

74. The Cable affidavit alleged, under oath, that Cable had personal knowledge that Nationstar "has possession of the promissory note, which has been duly indorsed in blank." *See* Cable Affidavit, ¶ 3.

75. Hemphill subsequently conducted discovery in Foreclosure No. 3 and requested that Nationstar produce a witness for deposition. In her notice of deposition, Hemphill requested that Nationstar produce the original note at the deposition.

76. On September 8, 2017, Hemphill deposed Curtis Swartz, Nationstar's corporate designee.

77. During his deposition, Swartz claimed that "if [Nationstar] hold[s] the note, then, you know, that would give us the right to execute the foreclosure...." N.T. 9:2-3.

78. When first asked if Nationstar possessed the note, Swartz claimed, under oath, that he had actually reviewed the original note:

"Q.      Now, have you reviewed the original promissory note in this case before you came here today?
A.      Yes.
Q.      Does Nationstar have a copy of the original promissory note?
A.      I believe so, yes."

N.T. 54:16-21.

79. After Hemphill requested to review the original note at the deposition, Swartz suddenly changed his testimony and conceded that Nationstar did not possess the note after all:

"Q.     Okay. So does Nationstar have possession of the promissory
note?

A.      No."

N.T. 60:13-15.

80. In addition to the deposition, Hemphill also conducted discovery through
    written interrogatories and requests for production of documents.

81. In response to interrogatories, Nationstar claimed that "[Nationstar] was
    the current owner of the Mortgage."

82. After Hemphill completed discovery, Nationstar filed a new motion for
    summary for judgment.

83. In this second motion, Nationstar offered a second sworn affidavit from
    Ryan Cable.

84. In the second Cable affidavit, Nationstar now admitted that it did not
    have possession of the note but claimed that it was nevertheless entitled
    to judgment.

85. Cable also attached a payment history which he claimed was "created by
    [Nationstar] as regular practice."

86. Nationstar and Milstead made the statements in the affidavit with the
    intention that the Court would rely on them and enter summary
    judgment.

87. Included within the documents that Cable claimed were "created by
    [Nationstar]", were payments histories that were actual created by other
    mortgage servicers.

88. Cable never made any attempt to disclose that some of the payment
    history documents were made by other entities that had no relationship to
    Nationstar and were not actually "created by [Nationstar]", contrary to his
    sworn testimony.

89. The matter ultimately proceeded to a non-jury trial on February 27, 2018.

90. On February 20, 2018, long after the expiration of the discovery deadline in Foreclosure No 3, Nationstar provided "Supplemental" responses to discovery. In these new responses, Nationstar materially changed many of its prior answers to Hemphill's discovery requests. Nationstar also disclosed, for the first time, that the Mortgage was actually owned by Everbank, not Nationstar.

91. During the trial, Nationstar offered the testimony of Curtis Swartz.

92. The Court took issue with Swartz's testimony, specifically as it related to Nationstar's standing to foreclose.

93. The Court took the unusual step of providing an "advisory opinion" during the trial and suggested to Nationstar that it may lose if the trial proceeded.

94. Nationstar stopped its testimony and motioned the Court for a voluntary nonsuit. As grounds, Nationstar conceded that it lacked standing to foreclose.

95. The Court granted Nationstar's motion and nonsuit was entered on February 28, 2018.

   **b. THE PERVERSION OF FORECLOSURE DIVERSION**

96. In response to the collapse of the housing market and the ensuing epidemic of foreclosures, Courts in several Counties of Pennsylvania developed foreclosure diversion programs designed to have lenders and borrowers explore alternatives to mortgage foreclosure, such as mortgage modifications, short sales or deeds in lieu of foreclosure.

97. In 2008, the Philadelphia Court of Common Pleas implemented Joint General Court Regulation No. 2008-01, establishing a Residential Mortgage Foreclosure Diversion Program applicable to foreclosures of owner-occupied homes in the City of Philadelphia.

98. Under this Regulation, after the filing of a mortgage foreclosure case on an owner-occupied home, the Court issues a case management order scheduling a conciliation conference between the mortgage lender and borrower.

99. The case management order requires that defendant-borrower contact the "Save Your Home Philly Hotline" hotline or visit www.saveyourhomephilly.org for free assistance in participating in the diversion program.

100. The City advertises and advises homeowners through the "Save Your Home Philly Hotline" that services of the program are sponsored by the City of Philadelphia and are free of charge.[3]

101. Nationstar also solicits directly to borrowers, including Hemphill, through mail, telephone and in-person contacts, encouraging borrowers to apply for mortgage assistance and loss mitigation programs.

102. At all relevant times, Nationstar represented to borrowers, including Hemphill, that there was no cost to apply for and participate in loss mitigation programs.

103. While Nationstar makes claims like "[w]e never charge fees for applying or approving loan modifications"[4], as explained *infra*, Nationstar does, in fact, charge borrowers thousands of dollars in unnecessary and unearned fees if borrowers participate in diversion programs. And, when homeowners are approved for loan modifications, Nationstar profits by capitalizing these fees into the principal balance of the loan so that they can charge interest on these fees.

---

[3] For example, *see* http://saveyourhomephilly.org/ (last accessed June 26, 2018). ("The Program is a joint effort of the Philadelphia Court of Common Pleas and the City of Philadelphia's Division of Housing and Community Development, which funds the SaveYourHomePhilly Hotline and the Housing Counseling program. **The service is provided free to Philadelphia homeowners.** Since it began in 2008, the Program has saved more than 11,000 homes from foreclosure."). (Emphasis supplied).

[4] https://www.mrcooper.com/support/mortgage_assistance/application_process (last accessed June 26, 2018).

104.   Servicers and foreclosure mills, like Nationstar and Milstead, have
used diversion programs to generate millions of dollars in unearned fees
at the expense of unsophisticated borrowers. Here's how the scam works:

   a. The Philadelphia Court of Common Pleas schedules, on average,
      approximately two hundred borrowers to attend diversion court
      every Thursday.

   b. The conferences are informal and not presided over by a judge;
      conferences typically only involve discussions between the lender or
      their representative and homeowners and their housing counselors
      about whether a borrower has applied for mortgage assistance and
      whether the homeowner's application is complete.

   c. Because hundreds of conferences are scheduled for the same time
      and date, large foreclosure mills and servicers, like Nationstar and
      Milstead, will typically have numerous diversion conferences
      scheduled at the same time and date.

   d. In most instances, each conference lasts mere minutes, but rather
      than charge for actual time or expenses expended or incurred in
      each case, foreclosure mills and servicers charge large, flat-rate fees
      for each homeowner that attends a conference. So even if the
      conference simply results in a continuance, the homeowner gets
      charged additional flat-rate "legal" fees or "corporate advances".

   e. To maximize profits and minimize staff, foreclosure mills like
      Milstead hire "local counsel" to attend conferences on their behalf.
      Milstead pays local counsel a lower rate, but still charges
      homeowners their larger flat-rate fee and simply pockets the
      difference between their rate and local counsel's rate. This allows
      the foreclosure mill to still profit from the diversion program, even
      if no employee or attorney from the firm ever actually attended the

conference. In the case of Hemphill's loan, Milstead used local counsel on more than one occasion.

f. By charging large, flat-rate fees for numerous conferences held at that same time, foreclosure mills like Milstead can use associate attorneys with limited years of experience to generate revenue that **far** exceeds the hourly rates of the most experienced partners at large, international law firms.

g. If a loan modification is approved, servicers recoup these fees (with interest) by capitalizing them into the loan modification. If a modification is not approved, the fees are recouped from the collateral or mortgage insurance. In the case of federally-insured loans (like Hemphill's loan), the excessive fees are reimbursed to Nationstar and Everbank by the Department of Housing and Urban Development.

105. After Hemphill's participation in the diversion program, Nationstar added a total of over **five-thousand dollars** in fees to Hemphill's account solely for her participation in the diversion program and her attempts to modify her mortgage.

106. Nationstar tried to collect these fees in their second motion for summary judgment by characterizing them as a "corporate advance". Nationstar never disclosed to the Court or Hemphill that these fees were actually charged to Hemphill's account solely for her participation in the diversion program and her attempts to modify her mortgage.

IV.   **CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT**
**HEMPHILL V. NATIONSTAR MORTGAGE LLC**

107.   Plaintiff incorporates paragraphs 1 through 106 as though set forth at length herein.

108.   Nationstar Mortgage LLC is a mortgage servicer that services residential mortgage loans on behalf of third party mortgage lenders and investors.

109.   At some point after the commencement of Foreclosure No. 2, Nationstar assumed the servicing of the Mortgage on Hemphill's home.

110.   Upon information and belief, Nationstar entered into an agreement with Everbank to service the loan on Everbank's behalf.

111.   When Nationstar assumed the servicing of Hemphill's loan on behalf of Everbank, the loan was already allegedly in default.

112.   At all relevant times, Nationstar acted as a debt collector as that term is defined by the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*

113.   Nationstar employed false, deceptive and misleading representations and means in connection with the collection of an alleged debt prohibited under 15 U.S.C. § 1692e(2)(A), (2)(B), (5), and (10) and utilized unfair practices prohibited by 15 U.S.C. § 1692f(1). Examples of these practices include, but are not limited to:

   a.   Attempting to collect patently unreasonable attorney fees far in excess of the express limits imposed by the Mortgage;

   b.   Mischaracterizing attorney's fees as "Corporate Advances" in a concerted attempt to collect fees in excess of the limits imposed by the mortgage documents;

    c. Making material misrepresentations about Nationstar's alleged status as the holder of the mortgage note, and taking affirmative action to conceal the fact that Nationstar did not actually possess the note;

    d. Doctoring exhibits and other documents to mislead Hemphill and disguise the fact that the exhibits were not actual copies of the original documents;

    e. Making knowingly false verifications and statements under oath in an attempt to foreclose on Hemphill's home.

114. As a result of Nationstar's deceptive, misleading, unfair and abusive debt collection practices, Hemphill has been subjected to years of personal humiliation, embarrassment, mental anguish and emotional distress.

115. Hemphill has also suffered significant financial losses as a result of the practices employed by Nationstar. These financial losses include, but are not limited to, lost wages and travel expenses, additional legal expenses, and loss of equity and value in Hemphill's home.

WHEREFORE, Plaintiff Jocelyn Hemphill respectfully requests judgment in her favor, and against Defendant Nationstar Mortgage, LLC d/b/a Mr. Cooper, for actual and compensatory damages, including damages for emotional distress, statutory damages, an award of attorney's fees and costs, and such other relief as may be appropriate.

## SECOND CAUSE OF ACTION
### VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
### HEMPHILL V. MILSTEAD & ASSOCIATES, LLC

116. Plaintiff incorporates paragraphs 1 through 115 as though set forth at length herein.

117.   Defendant Milstead & Associates, LLC ("Milstead") is a law firm dedicated to the foreclosure of residential homes on behalf of third-party mortgage holders/servicers throughout Pennsylvania.

118.   Milstead is a "debt collector" as that term is defined by the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*

119.   Milstead uses a business model that has often been referred to as a "foreclosure mill." The firm handles a very high volume of cases throughout a large geographic area—all sixty-seven counties in Pennsylvania—by using primarily unlicensed non-attorney support staff to perform most functions.

120.   Milstead's "foreclosure mill" business model means that the firm employs only a minimal number of attorneys to address the high-volume of cases they handle.

121.   On July 2, 2014, attorney Robert W. Williams, Esquire commenced a foreclosure action against Hemphill (Foreclosure No. 3).

122.   At the time, Williams was employed by Milstead and acted entirely within the scope of his employment.

123.   In the complaint, signed by Williams, Nationstar sought the collection of liquidated amounts for alleged principal, interest, escrow advances and corporate advances.

124.   The corporate advances claimed in the initial complaint totaled only $39.00 and did not include any amounts for attorney fees or expenses alleged to have been incurred in Foreclosure Nos. 1, 2 or 3.

125.   The complaint sought no liquidated amount for attorney fees, and the *ad damnum* only vaguely sought "additional attorney's fee (if any) hereafter incurred."

126.   After the complaint was filed, Foreclosure No. 3 proceeded to the foreclosure diversion program.

127.   Milstead charged excessive, unearned flat-rate fees for its role in the diversion program.

128.   On more than one occasion no attorneys or employees from Milstead even attended the conferences. Instead, Milstead paid third-party "local counsel" to attend. Milstead would pay these attorneys a lower rate, but still submit invoices for their own higher rate, skimming the difference between local counsel's rate and their own as unearned profits at Hemphill's expense.

129.   On June 29, 2017, attorney Roger Fay filed and served a motion for summary judgment in Foreclosure No. 3.

130.   Fay was acting at all relevant times within the scope of his employment as an attorney at Milstead.

131.   Fay had actual knowledge that Nationstar did not possess the original promissory note signed by Hemphill but made knowing misrepresentations that "[Nationstar was] entitled to enforce the Mortgage by way of its possession of the original Note."

132.   Fay also had an employee of Nationstar sign an affidavit, under oath, which contained willful and intentionally false statements.

133.   These material misrepresentations include false statements that Nationstar had possession of the original note and that business records attached to Nationstar's motion were created by Nationstar when, in fact, they were actually created by non-parties to the litigation long before Nationstar began servicing the loan.

134.   On December 4, 2017, Fay filed a second motion for summary judgment on Nationstar's behalf.

135.   Like Fay's first motion, it contained an affidavit signed under oath by Nationstar. Likewise, this affidavit tried to falsely pass off business

records as being created by Nationstar even though Fay and the affiant knew or reasonably should have known they were not.

136. This second motion now, for the first time, also sought to collect over twenty thousand dollars in fees allegedly incurred in Foreclosure Nos. 1, 2, & 3 (fees which were specifically not demanded in the complaint). The motion also demanded, for the first time, to collect over five thousand dollars in fees allegedly charged to Hemphill simply for participating in the foreclosure diversion program.

137. Milstead employed materially false, deceptive and misleading representations and means in connection with the collection of an alleged debt prohibited under 15 U.S.C. § 1692e(2)(A), (2)(B), (5), and (10) and utilized unfair practices prohibited by 15 U.S.C. § 1692f(1).

138. Examples of Milstead's improper conduct includes, but is not limited to:

   a. Attempting to collect patently unreasonable attorney fees far in excess of the express limits imposed by the Mortgage;

   b. Making material misrepresentations about Nationstar's alleged status as the holder of the mortgage note, and taking affirmative actions to conceal the fact that Nationstar did not actually possess the note;

   c. Doctoring and/or altering exhibits and other documents to actively mislead Hemphill and disguise the fact that the exhibits were not actual copies of the original documents;

   d. Drafting and using affidavits and other documents, signed under oath, to attempt to foreclose on Hemphill's home when Milstead knew that the statements in those documents were false.

139.   As a result of Milstead's deceptive, misleading, unfair and abusive debt collection practices, Hemphill has been subjected to years of personal humiliation, embarrassment, mental anguish and emotional distress.

140.   Hemphill has also suffered significant financial losses as a result of the practices employed by Milstead. These financial losses include, but are not limited to, lost wages and travel expenses, additional legal expenses, and loss of equity and value in Hemphill's home.

WHEREFORE, Plaintiff Jocelyn Hemphill respectfully requests judgment in her favor, and against Defendant Milstead & Associates, LLC, for actual and compensatory damages, including damages for emotional distress, statutory damages, an award of attorney's fees and costs, and such other relief as may be appropriate.

### THIRD CAUSE OF ACTON
### VIOLATIONS OF THE UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### HEMPHILL V. NATIONSTAR MORTGAGE LLC AND EVERBANK

141.   Plaintiff incorporates paragraphs 1 through 140 as though set forth at length herein.

142.   Defendants Nationstar and Everbank are engaged in trade and commerce within the Commonwealth of Pennsylvania as those terms are defined in Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UDAP), 73 P.S. § 201-1, *et seq*.

143.   Nationstar and Everbank employed unfair and deceptive acts and practices prohibited under 73 P.S. § 201-3 by engaging in fraudulent and deceptive conduct as defined by 73 P.S. § 201-2(xxi).

144.   More specifically, Defendants solicited and encouraged Hemphill to apply for and participate in loan modification programs through telephone, mail and in person contact attempts.

145.   At all relevant times, Defendants represented that Hemphill that participation was "free" and she would not be charged fees to apply for or participate in loan modification programs.

146.   Defendants lied. Despite their promises of "free" help and their representations that they did not charge fees for participation, at all relevant times Nationstar had a policy of approving and rubber-stamping large, flat-rate fees for borrowers attempting to participate in loan modification programs through programs like the foreclosure diversion program offered by the City of Philadelphia.

147.   Hemphill justifiably relied on the solicitations and representations made by the Defendants offering "free" help in applying for and participating in the loss mitigation programs.

148.   Hemphill suffered pecuniary losses, including, *inter alia*, travel expenses, lost wages and additional legal expenses incurred obtaining help to participate in and apply for a loan modification with Nationstar and Everbank.

WHEREFORE, Plaintiff Jocelyn Hemphill respectfully requests judgment in her favor, and against Defendant Nationstar Mortgage, LLC d/b/a Mr. Cooper and Everbank, for actual and compensatory damages, including damages for emotional distress, statutory damages, treble damages, an award of attorney's fees and costs, and such other relief as may be appropriate.

### FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT
### HEMPHILL V. NATIONSTAR MORTGAGE LLC AND EVERBANK

149.   Plaintiff incorporates paragraphs 1 through 148 as though set forth at length herein.

150.   The Mortgage and Note represent a written contract between the Hemphill and Defendants Nationstar and Everbank.

151.   Defendants materially breached the contracts by imposing fees, costs and other charges on Hemphill well in excess of the limits imposed by the terms of their agreement.

152.   In addition to the express terms of the mortgage documents, Defendants owed an implied duty of good faith and fair dealing.

153.   Defendants violated the covenants of good faith and fair dealing by engaging in conduct that violates standards of decency, fairness and reasonableness.

154.   Hemphill has suffered damages because of the Defendants' breaches, which includes, but is not limited to, improper and excessive fees and costs charged by Nationstar, as well as expenses related to Hemphill's attempts to participate and apply for loss mitigation.

WHEREFORE, Plaintiff Jocelyn Hemphill respectfully requests judgment in her favor, and against Defendant Nationstar Mortgage, LLC d/b/a Mr. Cooper and Everbank, for actual and compensatory damages, and such other relief as may be appropriate.

### FIFTH CAUSE OF ACTION
### CONSTRUCTIVE FRAUD
### HEMPHILL V. NATIONSTAR MORTGAGE LLC

155.   Plaintiff incorporates paragraphs 1 through 154 as though set forth at length herein.

156.   Nationstar actively solicits borrowers such as Hemphill to apply for loan modifications.

157.   Nationstar claims to be trustworthy, even advertising and representing that they provide community outreach "to keep the dream of

home ownership alive" to include free counseling, education and assistance with foreclosure alternatives, like mortgage modifications.[5]

158.   Furthering its efforts to bolster trust, Nationstar warns borrowers to beware of "scams" from others attempting to help them apply for loan modifications, reassuring borrowers that Nationstar "never charge[s] fees for applying or approving loan modifications."[6]

159.   An unequal relationship exists between Nationstar, and mortgage borrowers like Hemphill seeking mortgage assistance, which results in a relationship of confidence.

160.   Hemphill relied on the representations made by Nationstar that there would be no fees or charges related to her attempts to modify her mortgage with Nationstar.

161.   Nationstar knew or reasonable should have known that its representations were false and, in fact, Nationstar has actually charges borrowers extraordinary fees and costs to apply for modifications through community-sponsored foreclosure diversion programs, like the diversion program sponsored by the City of Philadelphia.

162.   In July 2016, Hemphill's participation in the diversion program and her effort to modify her loan through Nationstar ended.

163.   Nationstar subsequently assessed more than five-thousand dollars in fees attributable solely to her participation in the program and her attempt to apply for a loan modification with Nationstar.

164.   Nationstar's false representations caused Hemphill to incur thousands of dollars in improper fees charged to her account, and caused her to incur additional damages and expenses, including transportation costs and lost wages, related to her attempts to modify her loan with Nationstar.

---

[5] https://www.mrcooper.com/corporate_responsibility/outreach (last accessed June 29, 2018).
[6] https://www.mrcooper.com/support/mortgage_assistance/application_process (last accessed June 29, 2018).

165.   Nationstar's false and misleading representations breached the confidential relationship between Nationstar and Hemphill and amounted to constructive fraud.

166.   The conduct of the defendants was outrageous, malicious, wanton, willful, reckless and intentionally designed to inflict harm upon Hemphill.

WHEREFORE, Plaintiff Jocelyn Hemphill respectfully requests judgment in her favor, and against Defendant Nationstar Mortgage, LLC d/b/a Mr. Cooper, for actual and compensatory damages, including damages for emotional distress, punitive damages, and such other relief as may be appropriate.

### SIXTH CAUSE OF ACTION
### VIOLATIONS OF PENNSYLVANIA'S ACT 6
### HEMPHILL V. NATIONSTAR MORTGAGE LLC AND EVERBANK

167.   Plaintiff incorporates paragraphs 1 through 166 as though set forth at length herein.

168.   Nationstar is a "residential mortgage lender" as that term is defined by 41 P.S. § 101.

169.   Hemphill is a "residential mortgage debtor" as that term is defined by 41 P.S. § 101.

170.   The Mortgage is a "residential mortgage" as that term is defined by 41 P.S. § 101.

171.   Nationstar contracted for and charged Hemphill unreasonable attorney fees prohibited under 41 P.S. § 406.

172.   Hemphill has been affected by Nationstar's imposition of illegal and improper fees and has suffered pecuniary damages as a result of Nationstar's actions.

173.   Hemphill has also suffered signification humiliation, embarrassment, and emotion distress as a result of Nationstar's violations.

WHEREFORE, Plaintiff Jocelyn Hemphill respectfully requests judgment in her favor, and against Defendant Nationstar Mortgage, LLC d/b/a Mr. Cooper and Everbank, for actual and compensatory damages, including damages for emotional distress, an award of attorney's fees and costs, and such other relief as may be appropriate.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands a trial by jury in this action of all issues so triable.

Date: 7/5/18

Respectfully submitted:

Sean P. Mays
ID No. 307518
**THE MAYS LAW FIRM PC**
65 W. Street Road, Suite B102
Warminster, PA 18974
(215) 792-4321
sean@maysfirm.com

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on, a true and correct copy of the foregoing Amended Complaint was served on the following via first class mail, postage prepaid:

Kelli A. Lee, Esq.
McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
*Counsel for Nationstar Mortgage, LLC d/b/a Mr. Cooper and Everbank*

Megan Linsley Davis, Esq.
Patricia Fecile-Moreland, Esq.
Marks, O'Neill, O'Brien, Doherty & Kelly, P.C.
One Penn Center
1617 John F. Kennedy Boulevard
Suite 1010
Philadelphia, PA 19103
*Counsel for Milstead & Associates, LLC*

Date: 7/5/18

Respectfully submitted:

Sean P. Mays
ID No. 307518
**THE MAYS LAW FIRM PC**
65 W. Street Road, Suite B102
Warminster, PA 18974
(215) 792-4321
sean@maysfirm.com

*Attorney for Plaintiff*